No. 02-191

IN THE SUPREME COURT OF THE STATE OF MONTANA

2003 MT 151

KLARA E. OLSON
and RUSSELL RICHARD OLSON,

        Plaintiffs, Counter-Defendants and Respondents,

    v.

ROBERT L. OSMOLAK
and ANN K. OSMOLAK,

        Defendants, Counter-Claimants and Appellants.


APPEAL FROM:    District Court of the Eighth Judicial District,
                  In and for the County of Cascade, Cause No. BDV 98-962
                  The Honorable Julie Macek, Judge presiding.


COUNSEL OF RECORD:

        For Appellants:

                K. Dale Schwanke, Jardine, Stephenson, Blewett & Weaver, Great Falls, Montana

        For Respondents:

                Sean M. Morris, Worden, Thaine & Haines, Missoula Montana


                              Submitted on Briefs:  October 24, 2002

                                  Decided:  June 3, 2003

Filed:

_____
Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1     Ann and Robert Osmolak filed suit against Klara and Russell Olson seeking an injunction in connection with a land deal between the parties. The Osmolaks voluntarily dismissed the suit prior to the show cause hearing. The Olsons then sued for attorney fees, which they were awarded on summary judgment. We reverse and remand.

## ISSUES

¶2     A restatement of the issues the Osmolaks present on appeal follows:

1. Did the District Court err in awarding summary judgment to the Olsons?

2. Did the District Court err when it concluded that the Olsons' damages included attorney fees incurred prior to the dismissal of the temporary restraining order as well as fees incurred pursuing attorney fees in that action and in this appeal?

3. Did the District Court abuse its discretion by awarding the amount of attorney fees and costs it awarded in this matter?

## FACTUAL AND PROCEDURAL BACKGROUND

¶3     In May 1994, Ann and Robert Osmolak (the Osmolaks) bought ranch lands from Klara and Russell Olson (the Olsons) for $435,000. The Osmolaks made a down payment of $250,000 and agreed to pay the remaining $185,000 in installments over a maximum of ten years, pursuant to a promissory note secured by a mortgage on the land.

¶4     The sale included transfer of a State of Montana Grazing Lease (grazing lease) and a U.S. Forest Service Grazing Permit (permit). The buy-sell agreement between the parties (agreement) obligated the Olsons to keep and maintain the grazing lease and permit for transferral to the Osmolaks when the $435,000 purchase price was paid in full. According

2

to the contract, any breach of the agreement that led to the loss of either the grazing lease or the permit was a material breach.

¶5     By the fall of 1997, just three-and-a-half years after the sale, the Osmolaks had paid all but $500 of the $435,000 purchase price.  By happenstance, they then learned through a conversation with an employee of the U.S. District Ranger office that the Olsons had had the permit reassigned to their own property the year before, and that the Olsons were selling some of their property with the stipulation that the permit would be waived back to the Forest Service.  Mr. Osmolak and the Forest Service employee allege that the purpose of this waiver was to allow the Olsons to include the permit in a future land sale, despite that the Osmolaks were entitled to it per the agreement.

¶6     Based on this information, the Osmolaks believed the Olsons had breached the agreement with regard to the permit and feared the grazing lease was also in jeopardy.  On November 19, 1997, they filed suit against the Olsons, seeking injunctive relief.  The object of the suit was to assure the Olsons' compliance with the terms of the agreement, with respect to both the permit and the grazing lease.   Judge McKittrick issued a temporary restraining order (TRO) on November 24, 1997, prohibiting the Olsons from taking any action that would jeopardize either the state lease or the permit.

¶7     A show cause hearing was set for December 3, 1997 and then rescheduled for December 9, 1997.  Before the hearing, Russell Olson spoke with the Osmolaks' attorney and assured him that the Olsons intended to perform as agreed in the buy-sell agreement. Given this assurance, the Osmolaks saw no need to continue with the litigation.  The

3

Osmolaks' attorney, satisfied that the Olsons would comply with the terms of the agreement, filed a praecipe to dismiss the action without prejudice on December 8, 1997, fourteen days after the TRO was issued.

¶8 Following the dismissal of the Osmolaks' suit, the Olsons sought an award of attorney fees and costs. The affidavit of attorney fees and costs the Olsons filed on December 10, 1997, indicated they had incurred $2,847.50 in attorney fees in the two weeks prior to the dismissal of the TRO. Judge McKittrick conducted a hearing on the Olsons' motion and ruled on August 4, 1998, that he did not have jurisdiction to award fees, as his jurisdiction over the matter had terminated when the suit was dismissed.

¶9 In his order, Judge McKittrick addressed the underlying facts that led the Osmolaks to seek the TRO. He noted that "Defendant Russell Olson acknowledged [during the fee hearing] that the [Olsons] had without [the Osmolaks'] consent transferred the Forest Service permit [the Osmolaks] were ultimately to receive . . ." He went on to explain that the temporary restraining orders issued by the court had:

> simply restrained further transfer, conveyance or assignment of that permit, as well as the State of Montana grazing lease, and ordered the [Olsons] to apply to the U.S. Forest Service for assignment of the Permit and to do what was required to renew the State of Montana Grazing Lease [. . .], all acts that the Defendants through Russell Olson not only acknowledge were required of them pursuant to their agreement with [the Osmolaks], but are actions they in effect did take after dismissal of the within litigation. Russell Olson also did not dispute [the Osmolaks'] counsel's in court statements . . . that at the time of the first show cause hearing [the Olsons] had committed in the presence of counsel and Department of Interior representatives to cooperate with transfer of the permit and grazing lease to the [Osmolaks].

4

Judge McKittrick concluded his order by noting that the Osmolaks were "legitimately concerned" about the transfer of the grazing lease and permit to them; when they filed for the TRO, they had paid 99.9% of the $435,000 purchase price of the land.

¶10 After Judge McKittrick denied the Olsons' motion for damages based on lack of jurisdiction, the Olsons instituted a new suit, the action forming the basis for this appeal. Once again, they sought damages from the Osmolaks based on wrongful injunction. The Osmolaks filed a counterclaim against the Olsons alleging malicious prosecution.

¶11 On January 14, 1999, the Olsons filed a motion for summary judgment, arguing that the Osmolaks' voluntary dismissal of the TRO in the previous action had the same effect as a court decision finding that the Osmolaks were not entitled to the injunction. In response, the Osmolaks attempted to introduce into the record the reasons they had voluntarily dismissed the prior suit. The District Court, Judge Julie Macek presiding, relying on *Hatch v. National Surety Corp.* (1937), 105 Mont. 245, 72 P.2d 107, and *Sheridan County Electric Co-Op, Inc. v. Ferguson* (1951), 124 Mont. 543, 227 P.2d 597, disallowed the admission of this evidence, concluding the court had no discretion to look at why the Osmolaks dismissed the suit. The District Court granted summary judgment to the Olsons on June 5, 2001. The dismissal of the TRO prior to an adjudication on the propriety of the injunction was held to be an admission that the restraining order was without merit, entitling the Olsons to damages, including attorney fees and costs. On December 27, 2001, after a hearing on fees at which the Osmolaks contested the reasonableness of the Olsons' legal fees, the court awarded the Olsons $18,038.30 in fees and $225.83 in costs. The Osmolaks appeal.

5

**STANDARD OF REVIEW**

¶12    We review summary judgment orders *de novo*. *May v. ERA Landmark Real Estate of Bozeman*, 2000 MT 299, ¶ 17, 302 Mont. 326, ¶ 17, 15 P.3d 1179, ¶ 17. We use the same Rule 56, M.R.Civ.P., criteria as the district court. *Montana Metal Buildings, Inc. v. Shapiro* (1997), 283 Mont. 471, 474, 942 P.2d 694 (citing *Clark v. Eagle Systems, Inc.* (1996), 279 Mont. 279, 927 P.2d 995, 997). The party seeking summary judgment must demonstrate a complete absence of any genuine issues of material fact and that they are entitled to judgment as a matter of law. *Payne Realty and Housing, Inc. v. First Security Bank of Livingston* (1992), 256 Mont. 19, 24, 844 P.2d 90, 93. "If, but only if, the party seeking summary judgment meets this burden, [must] the nonmoving party . . . come forward with substantial and material evidence raising a genuine issue of material fact." *Shapiro*, 283 Mont. at 474, 942 P.2d at 696.

¶13    The purpose of summary judgment is to encourage judicial economy through the elimination of an unnecessary trial. *Payne Realty*, 256 Mont. at 24, 844 P.2d at 93. However, "summary judgment is an extreme remedy which should never be substituted for a trial if a material factual controversy exists." *Shapiro,* 283 Mont. at 474, 942 P.2d at 696.

**DISCUSSION**

**ISSUE ONE**

¶14    **Did the District Court err in awarding summary judgment to the Olsons?**

6

¶15     As indicated above, our inquiry upon review of summary judgment orders generally focuses on whether or not a genuine issue of material fact exists. In this case, however, the determinative question is whether or not the District Court erred as a matter of law when it declined to consider the factual circumstances underlying the dismissal of the TRO.

¶16     The Osmolaks ultimately dismissed the TRO voluntarily because--based on commitments by the Olsons--they became convinced the permit and grazing lease were secure pending their payment of the last $500 on the loan. They sought to offer evidence on this issue. The District Court concluded it had "no discretion to look at why the temporary restraining order was dismissed." We disagree and, therefore, we reverse.

¶17     Section 27-19-306(4), MCA (2001), allows "a person who is wrongfully enjoined [to file] an action for any claim for relief otherwise available to that person in law or equity. . . ." Because the TRO was voluntarily dismissed, there was no final court determination on the propriety--or lack thereof--of the restraining order. The Olsons argue that the Osmolaks' voluntary dismissal of the TRO had the same effect as a court decision finding that the Osmolaks were not entitled to the injunction, therefore rendering the Osmolaks liable per se for damages under § 27-19-306(4), MCA.

¶18     The Osmolaks, on the other hand, contend that their voluntary dismissal of the TRO should not be deemed conclusive evidence that the injunction was wrongfully issued. Rather, they argue, the court should consider the circumstances surrounding the dismissal of the TRO. Their voluntary dismissal was not an indication that the TRO was wrongly issued. Instead, they argue, it was acknowledgment that the problem between the parties was

7

resolved and that the Osmolaks felt secure that their property rights were appropriately protected.

¶19 Each party claims support for its position in Montana case law. The Olsons rely on *Hatch* and *Sheridan*. The District Court found the Olsons' argument persuasive and rested its decision on these two cases. In *Hatch*, the Great Northern Railway Company sued Hatch and others in Cascade County to restrain them from operating a truck on public highways between Butte and Helena in violation of Montana law. *Hatch*, 105 Mont. at 247, 72 P.2d at 108. A temporary restraining order was issued November 28, 1933, with a show cause hearing set to occur two weeks later, on December 12, 1933. When they received the TRO, defendants immediately ceased their trucking business in compliance with the order. On December 9, 1933, three days prior to the show cause hearing, the railway company voluntarily dismissed the Cascade County suit and the TRO was dissolved. However, the day before, the same plaintiffs, the railway company, had instituted a new suit on the same cause of action against the same defendant, Hatch--this time in Lewis and Clark County--that resulted in the issuance of a TRO similar to the first. *Hatch*, 105 Mont. at 247-48, 72 P.2d at 108-09.

¶20 We noted in *Hatch* that the dissolution of the TRO came about at the request of the plaintiff railway company. As the basis for our holding that the railway company was not entitled to the first TRO--and thus was liable to Hatch for damages--we quoted 32 C.J. § 774, p.450 as follows: "The voluntary dismissal or discontinuance by plaintiff of the action

8

in which the injunction was issued will have the same effect as a decision of the court that he was not entitled to the injunction, and gives rise to a cause of action on the bond.[sic]" *Hatch*, 105 Mont. at 249, 72 P.2d at 109. While we ended the quote as noted above, our citation was incomplete. 32 C.J. § 774, actually reads in pertinent part as follows:

> The voluntary dismissal or discontinuance by plaintiff of the action in which the injunction was issued will have the same effect as a decision of the court that he was not entitled to the injunction, and gives rise to a cause of action on the bond, *except in cases* where there is some special statutory provision to the contrary, where the wording of the bond is such as to take the case outside the operation of the rule, *where the dismissal was based only on the ground that the necessity for it has ceased,* where the discontinuance was corruptly induced, or where the dismissal was the result of a voluntary agreement of the parties . . . (Emphasis added.)

¶21 In *Hatch*, the plaintiff voluntarily dismissed the TRO only after seeking the same injunction against the same parties in a different jurisdiction. The exception italicized above obviously does not apply to the *Hatch* facts. The existence of this exception (and the others cited in the C.J.), however, requires that a party have the opportunity to show the reasons it dismissed a TRO voluntarily. If borne out on remand, the Osmolaks' contention that they were justified in seeking and subsequently dismissing the TRO puts this case squarely within the exception delineated in the C.J. The exceptions set forth in the current version of 43A C.J.S. § 320, p.710, would also apply. After reiterating that liability for the party seeking the injunction "does not arise where the voluntary dismissal is based only on the ground that the necessity for injunctive relief has ceased," the treatise goes on to provide that there is no liability if the voluntary dismissal "is brought about because of matters done or arising

9

subsequent to the issuance of a proper injunction . . ." In the case before us, it is certainly arguable that the Osmolaks voluntarily dismissed the injunction because the necessity for it had ceased. It is further arguable that the necessity had ceased precisely because of discussions and agreements between the parties subsequent to the issuance of the TRO, as it was the Olsons' agreement to abide by the terms in the buy-sell agreement that rendered the TRO unnecessary. In any event, if the dismissal of the TRO could indeed fall within the above exception, then resolution of the issue without considering the underlying circumstances is inappropriate.

¶22    We also conclude that the District Court's reliance on *Sheridan* was misplaced. The facts in *Sheridan* are broadly distinguishable from this case and, further, the central legal questions are different.

¶23    While the question in *Sheridan* was what conduct qualified as a *final determination*, here we seek to discern whether a voluntary dismissal of a TRO is per se equivalent to a court determination that an injunction was wrongly issued, or whether the court should consider evidence of the plaintiff's reasons for bringing and then dismissing the injunction action. *Sheridan* does not speak directly to this issue because under the facts in *Sheridan* there was no apparent evidence that the plaintiff's pursuit of the TRO was justified. The facts before us are quite different: in denying the Olsons' motion for damages in the first action, the District Court that issued the TRO went out of its way to make it clear that the

10

Osmolaks were justified in seeking the TRO. Thus, this case is clearly distinguishable from *Sheridan*.

¶24 We now turn to the precedent we find dispositive. In one of the first written opinions issued by this Court, we confronted a case remarkably similar to the one before us today. In *Stewart v. Miller* (1871), 1 Mont. 301, upon which the Osmolaks rely, the plaintiff reasonably and justifiably dismissed an injunction, only to find that the District Court refused admission of evidence about the reasons underlying the voluntary dismissal, and instead held the plaintiff liable for damages. We concluded the district court erred in disallowing this evidence. We held that a voluntary dismissal would constitute only *prima facie* evidence that a TRO was improperly issued. We said:

> Where the dissolution of an injunction is not consequent upon a final determination or adjudication upon the merits of the action, the obligors in the bond may, according to the weight of authority and principle, show the facts and circumstances entitling them to the injunction, if not in full defense, at least in mitigation of damages in an action upon the bond, the order of dissolution being in such cases only *prima facie* evidence that the injunction was improperly issued . . . otherwise, the obligees in a bond given in a cause in which the plaintiff was in equity entitled to the protection demanded, would, in an action upon the bond, stand upon the same footing in respect to damages recoverable, as though the injunction was obtained without a shadow of equity, or even maliciously, and through perjury. This we cannot believe to be the law, and the evidence offered in this action should have been admitted. (Emphasis in original.)

¶25 Given its legal and factual similarity to this case, we conclude that *Stewart* is controlling here. The Osmolaks were prevented from introducing into evidence any of the facts and circumstances that led to their dismissal of the TRO. As we indicated above, the

11

Osmolaks had arguably valid reasons for voluntarily dismissing the TRO against the Olsons, and the District Court that issued the TRO made clear its view that the Osmolaks had legitimate grounds for seeking the TRO in the first place. In excluding the Osmolaks' evidence in this proceeding, the District Court put the Osmolaks "on the same footing in respect to damages recoverable, as though the injunction was obtained without a shadow of equity, or even maliciously, and through perjury." We cannot abide by that outcome.

¶26 It serves neither the ends of justice nor judicial efficiency to impose a rule that encourages continued litigation when that litigation has become unnecessary. Were we to hold that every voluntary dismissal of a suit in which an injunction was issued is incontrovertible evidence that the injunction was wrongly issued, we would in effect force plaintiffs like the Osmolaks to continue pursuing a matter through the courts despite an early resolution of the dispute: a voluntary dismissal would automatically and categorically expose them to a judgment for damages based on wrongful injunction, even in those cases where the injunction was fairly issued.

¶27 This case provides an excellent example of the wastefulness of such an approach. After the Osmolaks voluntarily dismissed the original suit in 1997, the Olsons claimed attorney fees in the sum of $3085.50. After the Olsons' litigation was then pursued through two district courts over four years, the attorney fees claimed by the Olsons had ballooned to over $18,000, an increase in fees of over 500 percent. And this calculation does not account for the legal expenses incurred by the Osmolaks, nor those costs both parties undoubtedly

incurred pursuing this appeal. All these resources were utilized over a TRO that was in effect for fourteen days.

¶28 Based upon the compelling reasoning in *Stewart*, and on concerns about the incentives created by a contrary conclusion, we hold that where an injunction is voluntarily dismissed by the party who instituted the suit, that party may introduce into evidence the facts and circumstances entitling them to the injunction and leading to its dismissal, in full defense, or at least in mitigation, of damages in a subsequent action for wrongful injunction. The order of dissolution in such cases shall be only *prima facie* evidence that the injunction was improperly issued, and such may be rebutted by the party against whom damages are sought.

¶29 The District Court's decision to exclude evidence offered by the Osmolaks to show that they were entitled to the injunction, and to show why they dismissed it, was based on a misreading of *Hatch* and *Sheridan*. Neither case overrules *Stewart*. They are distinguishable. To whatever extent there was perceived conflict among the cases, our ruling today should clarify the issue.

¶30 For the foregoing reasons, we conclude the District Court erred as a matter of law in resolving this case on summary judgment. The Osmolaks should have been afforded the opportunity to present evidence demonstrating that they were entitled to the TRO they sought in 1997, and that their voluntary dismissal of the litigation was justified. Having

13

reached this conclusion, we do not reach the second and third issues presented by the Osmolaks on appeal.

## CONCLUSION

¶31 For the foregoing reasons, we reverse and remand this case to the District Court for further proceedings consistent with this Opinion.

/S/ PATRICIA COTTER

We Concur:

/S/ KARLA M. GRAY
/S/ W. WILLIAM LEAPHART
/S/ JIM RICE